IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the matter of the Detention of E.G.-R., | No. 81906-2-I |
| STATE OF WASHINGTON, | DIVISION ONE |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| E.G.-R., | |
| Appellant. | |

CHUN, J. — E.G.-R. displayed signs of decompensation. The State petitioned for 14 days of involuntary treatment under the Involuntary Treatment Act (ITA). The trial court found that E.G.-R. showed signs of "severe deterioration in routine functioning, evidenced by repeated & escalating loss of cognitive and volitional control over his actions such that, outside the hospital setting, he would not receive care that is essential to his health and safety." The court concluded that E.G.-R. was gravely disabled and ordered commitment. E.G.-R. appeals contending that insufficient evidence supports the court's finding. For the reasons discussed below, we affirm.

I. BACKGROUND

E.G.-R. lived with his mother (Adela Ramirez), father, and younger brother. His family helped him with housing, food, medication, and transportation to his mental health treatment provider.

Citations and pin cites are based on the Westlaw online version of the cited material.

Erich Flaker, a mental health therapist at Consejo Counseling and Referral Services, has been working with E.G.-R. since November 2019. On August 31, 2020, Flaker spoke with E.G.-R. on the phone and noted changes in his presentation. E.G.-R. presented "complex paranoid symptoms," spoke about "unreal" situations, exhibited disorganized thinking, and expressed concern about being sexually and physically abused. After the conversation, Flaker requested that a Designated Crisis Responder (DCR) evaluate E.G.-R.

Casey Locke, a DCR, and two of his colleagues evaluated E.G.-R. on September 7, 2020 at his parents' home. Locke observed that E.G.-R. was easily agitated, spoke in a disorganized manner, and was having paranoid delusions about being followed by a dead person. When the DCRs encouraged E.G.-R. to continue treatment services at Consejo he repeated, "'No'" and "'no means no.'" Similarly, when the DCRs asked him about medication, and whether he was currently taking any, he repeated, "'[N]o'" and "'no means no.'" The DCRs paused the evaluation and went outside to discuss less restrictive alternatives. When they returned, they suggested voluntary outpatient treatment at Consejo. E.G.-R. became agitated. He "puff[ed] up his chest," shouted at the DCRs, and "gestur[ed] with his arms." He threw a sock at one of the DCRs, hitting him in the face. He stepped towards the DCRs and told them to leave. The DCRs were concerned for their safety and left. Once outside, they called 911 to execute an emergency detention.

The same day, E.G.-R. was detained for 72 hours of psychiatric evaluation and treatment. He was transferred to Navos Hospital on September 8. The

State then petitioned for 14-day involuntary treatment under the ITA, claiming E.G.-R. posed a risk of harm to others and was gravely disabled.

On September 11, the trial court held a probable cause hearing.

*Ramirez's Testimony*

E.G.-R.'s mother Ramirez testified that, during the three months leading to hospitalization, she noticed behavioral changes including increased paranoia. About a month before hospitalization, E.G.-R. had accused a stranger at the grocery store of "fondling" his younger brother. Ramirez explained to E.G.-R. that it did not happen but she struggled to calm him. She was finally able to get E.G.-R. to leave the store but he remained upset.

Ramirez also described an incident, during the month before hospitalization, when she saw him leave the apartment very upset and cursing to himself. She watched him walk outside and throw a rock at a garbage can. When he returned, he went to his room and did not come out for the rest of the day. She did not ask him about it because she thought he would get upset. She did not know why he seemed so angry that day.

Ramirez said she is concerned about her family's and E.G.-R.'s safety when he is "not doing well" because he does not listen and is often difficult to calm down. She reported that he is happy, quiet, and relaxed when he is taking his medication.

*Locke's Testimony*

Locke testified at the hearing. He discussed the DCR evaluation and the circumstances prompting the decision to conduct an emergency detention. He said that during the evaluation, E.G.-R. "refused all mental health treatment."

*Flaker's Testimony*

Flaker testified that at his baseline, E.G.-R. is talkative, cooperative, and willing to engage in therapeutic services. But by August 31, E.G.-R. was displaying "complex paranoid symptoms" and delusional and disorganized thinking. Flaker concluded that E.G.-R. was gravely disabled because he could not provide for his own health and safety needs.

*Dr. Julia Singer's Testimony*

Finally, Dr. Julia Singer, a licensed clinical psychologist and court evaluator for Navos, testified as to the following. Singer had interviewed E.G.-R. on September 10. E.G.-R. was basically cooperative but "very ambivalent about treatment." He did not know why he was in the hospital and said he did not need treatment. He also said the last time he had taken some medication was three or four days before hospitalization.

Singer said her working diagnosis of E.G.-R. was Schizoaffective Disorder. She based this diagnosis off of E.G.-R.'s history of six involuntary hospitalizations and his current symptoms, including disorganized thinking, aggression, paranoia, delusions, impaired judgment and impulse control, and lack of insight. She was unsure about E.G.-R.'s capacity to live on his own and

meet his needs, and she was concerned he might try to live alone because he had expressed paranoia about his father.

Singer based her opinion in part on several records and she read them into the record. First, she read Flaker's declaration in support of the petition for detention dated August 31. Flaker noted that E.G.-R. was in a manic and irritable mood, and displayed delusional thinking and paranoia. E.G.-R. reported feeling threatened by "a terrorist" and "the cartel." He also said he pressed charges against his father with "'America's Most Wanted.'" Flaker noted that E.G.-R. "reported he would like to discontinue mental health services with Consejo reporting, 'I know what they're trying to do and I'm not going to do it.'"

Second, Singer read Dr. Brian Coleman's intake evaluation dated September 9. Coleman noted that E.G.-R. was suspicious but cooperative with treatment recommendations. E.G.-R.'s thought process was disorganized and he had paranoid delusions.

Third, Singer read a social services assessment by Susan Wagner dated September 10. E.G.-R. told Wagner he wanted to stop taking medication and leave the hospital. He said he did not need outpatient services and had no plan to seek treatment at Consejo or anywhere else after release. When Wagner asked about whether E.G.-R. would return home, he did not respond definitively. Instead, he made vague statements about not being a "kid anymore" and that his father was "unwell."

Finally, Singer read progress notes by advanced registered nurse practitioner Rebecca Skelly dated September 10 and 11. When Skelly checked

in with E.G.-R., he appeared to have minimum hygiene and grooming. He denied his symptoms and was unable to give a coherent answer as to the events preceding his hospitalization. On one day, he agreed he would probably benefit from psychiatric treatment but on the next, he denied the need for treatment. He was "[u]nable to identify a concrete plan to meet his basic needs in less restrictive setting."

*Trial Court Decision*

Following the hearing, the trial court found by a preponderance of the evidence that E.G.-R. suffered from a mental disorder. The court found that his mental disorder had a "substantial adverse effect on [his] cognitive and volitional functions." The court concluded that E.G.-R. was gravely disabled based on a finding that he showed "severe deterioration in routine functioning, evidenced by repeated & escalating loss of cognitive and volitional control over his actions such that, outside the hospital setting, he would not receive care that is essential to his health and safety." The court noted that E.G.-R.'s "staunch refusal for mental health frankly places him in a place where treatment for his mental disorder is absolutely essential to his own health and safety." The court emphasized that no evidence showed he would seek treatment or medication on his own, he had no specific discharge plan, and without treatment his symptoms would go unmanaged putting his health and safety at risk. The court did not find that E.G.-R. posed a risk of harm to others. The court ordered involuntary commitment of up to 14 days. E.G.-R. appeals.

6

## II. ANALYSIS

At a probable cause hearing for a 14-day commitment, the State must establish grave disability by a preponderance of the evidence. In re Det. of V.B., 104 Wn. App. 953, 963, 19 P.3d 1062 (2001) (citing RCW 71.05.240). "'[W]here the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment.'" In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015) (alteration in original) (quoting In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986)) "Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person of the truth of the declared premise." Id. "The party challenging a finding of fact bears the burden of demonstrating the finding is not supported by substantial evidence." In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998), aff'd sub nom. In re Det. of A.S., 138 Wn.2d 898, 982 P.2d 1156 (1999). Whether an individual is gravely disabled is a legal conclusion and we treat it as such. In re Det. of M.K., 168 Wn. App. 621, 624 n.4, 279 P.3d 897 (2012).

RCW 71.05.240(4)(a) provides:

[A]t the conclusion of the probable cause hearing, if the court finds by a preponderance of the evidence that such person, as the result of a behavioral health disorder, . . . *is gravely disabled*, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court shall order that such person be detained for involuntary treatment not to exceed fourteen days.

(Emphasis added.) RCW 71.05.020(24)(b) defines "gravely disabled" as when a person "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety."[1] This "prong B" definition sets forth two requirements, (1) severe deterioration in routine functioning, and (2) not receiving essential care. See LaBelle, 107 Wn.2d at 205.

E.G.-R. concedes that sufficient evidence supports a finding that he manifested "severe deterioration in routine functioning." He says insufficient evidence supports the finding that he "is not receiving such care as is essential for his [] health or safety." And he contends insufficient evidence supports a causal nexus between the two. To show that he "is not receiving such care as is essential for his [] health or safety," it is not enough to show that care and treatment "would be preferred or beneficial or even in his best interests," it must be essential. LaBelle, 107 Wn.2d at 208. And "the mere fact that an individual is mentally ill does not also mean that the person so affected is incapable of making a rational choice with respect to [their] need for treatment." Id. "'Implicit in the definition of gravely disabled . . . is a requirement that the individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to [their] need for treatment.'" In re Det. of A.M., 17 Wn. App. 2d

---

[1] RCW 71.05.020 contains two prongs under which a person can be considered "gravely disabled." "Prong A," which provides that a person is gravely disabled if they are "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety," is not at issue here.

321, 335, 487 P.3d 531 (2021) (alteration in original) (quoting LaBelle, 107 Wn.2d at 208). Satisfaction of this requirement "ensure[s] that a causal nexus exists between proof of 'severe deterioration in routine functioning' and proof that the person so affected 'is not receiving such care as is essential for [their] health or safety.'" LaBelle, 107 Wn.2d at 208.

Substantial evidence supports the trial court's finding that E.G.-R. was "showing severe deterioration in routine functioning, evidenced by repeated & escalating loss of cognitive and volitional control over his actions such that, outside the hospital setting, he would not receive care that is essential to his health and safety."[2] Evidence shows that he repeatedly stated that he would not continue his treatment or medication upon discharge and lacked insight about his mental state. He told Flaker he did not want to continue treatment with Consejo. He repeatedly told the DCRs "'no means no'" when they asked about treatment and medication. He became agitated and aggressive when they suggested outpatient treatment. Singer noted that E.G.-R. was confused about why he was in the hospital and said he did not need treatment. He told Singer he had not taken his medication for three or four days before hospitalization. He told Wagner he wanted to stop taking medication and leave the hospital. He also told her that he had no plan to seek treatment at Consejo or anywhere else and that he did not need such treatment. When Skelly evaluated him, he denied his

_____

[2] E.G.-R. contends his appeal is not moot despite the detention at issue having lapsed. The State responds that it is not pursuing any mootness argument. We do not address mootness. See M.K., 168 Wn. App. at 625 (holding that because involuntary commitment orders may have consequences for future commitment decisions, an appeal of such an order is not moot even if the detention at issue has ended).

9

symptoms and could not explain why he was in the hospital. Though he agreed treatment might be beneficial on one day, the next day he denied his need for it.

E.G.-R. made these comments while he displayed undisputed signs of severe deterioration in routine functioning; this shows that he was unable, because of such deterioration, to make a rational choice about his need for treatment. See A.M., 17 Wn. App. 2d at 335 (noting that the definition of gravely disabled requires that an "'individual is unable, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment.'" (quoting LaBelle, 107 Wn.2d at 208)). And the evidence shows that without treatment, E.G.-R. continued to decompensate. Thus, a causal nexus exists between his severe deterioration in routine functioning and not receiving care essential to his health and safety. See LaBelle, 107 Wn.2d at 208 (noting that when an individual is unable to make a rational choice about treatment, a causal nexus exists between severe deterioration in routine functioning and not receiving essential care).

E.G.-R. mostly focuses on why his lack of a discharge plan does not suffice to sustain a conclusion of grave disability. He concedes that the evidence shows that he lacked such a plan but he claims that this is irrelevant because evidence shows he would return home upon discharge and there his needs would be met. But the record lacks evidence showing that he would return home. And even if he did return home, his refusal to engage in treatment or take medication would still lead to further decompensation. See LaBelle, 107 Wn.2d at 213 (finding grave disability under prong B where "even if appellant were able

10

to provide for his essential food and shelter needs, [by staying with his sister], the evidence indicates that without treatment for his mental disorder he would rapidly exhibit those symptoms which resulted in his initial confinement.").

In A.M., the court determined that substantial evidence supported a finding that the appellant was "not receiving such care as is essential for his or her health or safety." 17 Wn. App. 2d at 330. A.M. involved a hearing for a 180-day involuntary commitment.[3] In determining that substantial evidence supported a finding under prong B, the court noted that the evidence showed that the appellant had "no insight into his mental illness, did not believe that he was mentally ill," "did not believe that he needed any medication," had a "history of noncompliance with medication," and had "three prior admissions for mental health treatment." Id. at 336. Here, the evidence is similar. The only difference is that the State offered no evidence of a history of noncompliance with medication, but E.G.-R. has had six prior hospitalizations.

The evidence the State presented at the hearing sufficed to persuade a fair-minded person that E.G.-R. showed "severe deterioration in routine functioning, evidenced by repeated & escalating loss of cognitive and volitional control over his actions such that, outside the hospital setting, he would not receive care that is essential to his health and safety." And this finding supports

---

[3] A 180-day commitment hearing involves a higher burden of proof. See A.M., 17 Wn. App. 2d at 330 ("The Petitioners' burden of proof in a 180-day involuntary commitment proceeding is by clear, cogent, and convincing evidence."). E.G.-R. contends that "the standard of proof is irrelevant to the underlying rule that there must be *some evidence* that release is incompatible with the respondent's essential health and safety needs." But the standard of proof pertains to our review of the issue. That the evidence in A.M. satisfied the clear, cogent, and convincing evidence standard suggests that similar evidence here satisfies the lower preponderance of the evidence standard.

the court's conclusion that E.G.-R. was gravely disabled.  <u>See</u> RCW 71.05.020(b).

We affirm.

_____
Chun, J.

WE CONCUR:

_____       _____
Bowman, J.                                               Verellen, J.